**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| **TRENICE M. REED and** | § | |
| **KENNETH REED,** | § | |
| *Plaintiffs,* | § | |
| | § | **CIVIL ACTION NO. _____** |
| **v.** | § | |
| | § | |
| **EK REAL ESTATE SERVICES OF NY,** | § | |
| **LLC, ET AL. ,** | § | |
| *Defendants.* | § | |

## ORIGINAL COMPLAINT

Plaintiffs **TRENICE M. REED AND KENNETH REED** file this *Original Complaint* against the unauthorized, predatory lending tactics of Defendants **EK REAL ESTATE SERVICES, OF NY, LLC**, an Affiliate of **EASYKNOCK, INC., EASYKNOCK, INC.,** and **LENDINGONE, LLC**, and seeks redress for, among other causes, multiple violations of the Truth In Lending Act, 15 U.S.C. § 1601, *et seq.* (hereinafter, "TILA") and Federal Reserve Board of Regulation Z, 12 C.F.R. § 226 promulgated pursuant thereto, and multiple violations of Texas Finance Code, including §§ 305.001, *et seq.*, and §§ 341.001, *et seq.,* and in support thereof would show the Court as follows:

## PARTIES

1.      Plaintiffs **TRENICE M. REED AND KENNETH REED** (collectively, the "**REEDS")** are residents of Brazoria County, Texas and are the persons who owned the real property at issue in this suit.

2.      Defendant **EK REAL ESTATE SERVICES OF NY, LLC, an Affiliate of EASYKNOCK, INC. ("EK REAL ESTATE"),** is a foreign limited liability company organized and existing under the laws of the State of Delaware but, as of September 27, 2019, is authorized

to do business in the State of Texas. **EK REAL ESTATE** conducted business in this state before that time, including in connection with the transactions at issue in this lawsuit, without properly being authorized to do so. **EK REAL ESTATE's** principal office is located at 79 Madison Avenue, 5th Floor, New York, NY 10016, and it may be served with a copy of this *Original Complaint* by and through its registered agent for service, Corporation Services Company d/b/a CSC – Lawyers Incorporating Service Company, 211 East 7th Street, Suite 620, Austin, Travis County, Texas 78701.

3.     Defendant **EASYKNOCK, INC., ("EASYKNOCK")** is a foreign corporation organized and existing under the laws of Delaware whose principal office is 215 Park Avenue South, Suite 1713, New York, NY 10003. **EASYKNOCK** is the sole member of Defendant **EK REAL ESTATE**. **EASYKNOCK** regularly engages in business in Texas without registering with the Texas Secretary of State for the right to do business in Texas, including in connection with the transactions at issue in this lawsuit; thus, **EASYKNOCK** may be served through the Texas Secretary of State pursuant to FED. R. CIV. P. 4(h)(1)(A) and TEX. CIV. PRAC. & REM. CODE § 17.044, via US Mail: Service of Process, Secretary of State, P.O. Box 12079, Austin, Texas 78711-2079, or via Overnight Delivery: Service of Process, Secretary of State, James E. Rudder Building, 1019 Brazos, Room 105, Austin, Texas 78701.

4.     Defendant **LENDINGONE, LLC ("LENDINGONE")** is a foreign corporation organized and existing under the laws of the State of Delaware but, as of July 2, 2020, is authorized to do business in the State of Texas. **LENDINGONE** conducted business in this state before that time, including in connection with the transactions at issue in this lawsuit, without properly being authorized to do so. **LENDINGONE's** principal office is located at 901 Northwest 51st Street, Suite 150, Boca Raton, FL 33431, and it may be served with a copy of this *Original Complaint* by

serving its registered agent for service Registered Agents, Inc., 5900 Balcones Drive, Suite 100, Austin, Travis County, Texas 78731.

## JURISDICTION

5.     Jurisdiction is proper in this Court for the violations of the Truth-In-Lending Act pursuant to 15 U.S.C. §§ 1601, *et seq.*, as well as 28 U.S.C. §§ 1331 and 1337. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and the amount in controversy exceeds $75,000.00, excluding interest and costs. This Court has jurisdiction over the Texas state law claims under principles of pendent and ancillary jurisdiction.

6.     This Court has general personal jurisdiction over Defendants **EK REAL ESTATE**, **EASYKNOCK**, and **LENDINGONE** under the Texas long-arm statute, TEX. CIV. PRAC. & REM. CODE §§ 17.041, *et seq.*, because, as described in this Complaint, each Defendant has purposefully availed itself of the benefits of conducting business in Texas, each Defendant's contacts with Texas are continuous and systematic, and each Defendant can be considered essentially at home in Texas. This Court also has specific personal jurisdiction over Defendants **EK REAL ESTATE**, **EASYKNOCK**, and **LENDINGONE** under the Texas long-arm statute, TEX. CIV. PRAC. & REM. CODE §§ 17.041, *et seq.*, because, as described in this Complaint, each Defendant purposefully directed its wrongful activities at the **REEDS**, residents of the forum, each Defendant's conduct caused, and the **REEDS'** suit seeks redress for, harm caused by each of Defendant's wrongful actions which either took place inside of the forum and/or were purposefully directed at the **REEDS** in the forum.

## VENUE

7.      Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2) and Tex. Fin. Code § 349.401 since this case arises from a dispute concerning real property situated in Brazoria County, Texas and because the Southern District of Texas—Galveston Division, the judicial district in which Brazoria County, Texas sits, is a judicial district in which the underlying transactions and a substantial part of the events or omissions giving rise to the claims occurred. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(1) because, for venue purposes, each Defendant is deemed to reside in Brazoria County, Texas since each Defendant is subject to the court's personal jurisdiction in this judicial district with respect to this civil action in question and, for venue purposes, all Defendants are deemed residents of the State in which the district is located.

## FACTS

On or about February 19, 2013, the **REEDS** purchased a house and the real property located at 3119 Longhorn Circle, Manvel, Texas 77578, more fully described as Lot Thirty-six (36), Block One (1), of Amended Final Plat of Southfork Section III, a Subdivision in Brazoria County, Texas ("the Property"). *(See Exhibit "A" – Special Warranty Deed with Vendor's Lien to the **REEDS** attached hereto and incorporated herein for all purposes.)* The **REEDS** resided at the Property continuously from that that date until December 26, 2019, when they were evicted from the Property.  At the time of the transactions at issue in this dispute, the Property was designated as the **REEDS'** residential homestead.

8.      In 2018, Plaintiff **KENNETH REED** lost his job and with only one income and no savings to speak of, the **REEDS** quickly fell behind on their bills. The one asset the **REEDS** had was their homestead Property.  At that time, their Property was worth at least $400,000.  The only

encumbrance on their Property was a mortgage lien with a balance of about $170,000 so the **REEDS** had about $230,000 in equity in their Property.

9.      When a rainstorm caused damage to their Property, they could not afford the repairs. The **REEDS** sought to obtain a home equity loan to raise the funds needed for the repairs. Additionally, the **REEDS** were attempting to start a new business and hoped an equity loan would enable them to do so.   Unfortunately, the **REEDS** were unable to borrow money from a conventional financial institution because of credit issues, insufficient income, and the Property being their homestead.

10.     In the Fall of 2018, the **REEDS** conducted an Internet search for potential home equity lenders for folks with poor credit, low income, and no savings. Through this online search for a home equity lender, the **REEDS** found an alternative lender on the Internet, Defendant **EASYKNOCK**, the sole Member of **EK REAL ESTATE**. Upon information and belief, **EASYKNOCK** used online target ad words to increase its visibility on searches for home equity lenders. **EASYKNOCK** was one of the first results to appear in the **REEDS'** Internet search for home equity lenders.

11.     **EASYKNOCK** targets its advertisements on Google and Facebook to people like the **REEDS** who search for low income, no credit check, home equity loans.  Indeed, in its Google and Facebook advertisements, **EASYKNOCK** represents to the world that they offer "Home Refinance With Bad Credit – No Minimum Credit Requirements." *(See Exhibit "B" – Screenshot of Recent Example of **EASYKNOCK's** Home Refinance Advertisement on Google, with a link to easyknock.com website, a copy of which is attached hereto and incorporated herein for all purposes.)* **EASYKNOCK** also represents itself on Twitter and in its newsletter to customers and prospective customers as a provider of home refinancing and bridge loans. *(See Exhibit "C" –*

Screenshots of **EASYKNOCK** *Twitter Posts and its Newsletter, copies of which are attached hereto and incorporated herein for all purposes.)*  After seeing their advertisements online, the **REEDS** submitted an online inquiry to **EASYKNOCK** hoping to obtain a home equity loan.

12.     In their online advertising and during a series of follow-up email and phone call communications with this potential home equity lender in or about October and November 2018, **EASYKNOCK** indicated to the **REEDS** that it would loan them money based on a portion of the equity in their Property and the execution of a lease agreement.  What the **REEDS** did not know at the time (and what Defendants failed to inform them) is that **EASYKNOCK**, as part of its purported equity loan transaction, planned to remove the **REEDS'** names from the deed on their Property and place the deed to their Property entirely in the name of **EK REAL ESTATE**, its wholly owned subsidiary.  This type of transaction is known as a "Sale-Leaseback," and it is highly disfavored in Texas, particularly when the transaction involves a Texas citizen's homestead.

13.     Throughout these calls and emails, including in an illustration emailed to the **REEDS** on October 15, 2018, **EASYKNOCK** represented that the lease agreement would include an option to pay off **EASYKNOCK's** loan, which would be secured by a portion of the **REEDS's** equity in their Property—approximately 69.5% of the Property.  **EASYKNOCK** also promised the **REEDS** that they would retain the remaining equity in their Property, about 30.5%—the equity difference between the Property's total market value and the amount of **EASYKNOCK's** secured funding.

14.     All communications concerning the transaction between **REEDS** were with **EASYKNOCK** and its employees or representatives. All material sent to **REEDS** was sent by **EASYKNOCK,** the sole Member to Defendant **EK REAL ESTATE**.

1.      In their online advertising and during several calls and email communications in October 2018 with **EASYKNOCK's** so-called "Equity Specialists," Defendants **EASYKNOCK** and **EK REAL ESTATE's** assured **REEDS** that they could "release" the home equity in their Property while maintaining an equity interest in her home and keeping possession of her home. They further represented to the **REEDS** that they could either repay the loan and gain back the secured portion of the equity in their homestead Property or sell the Property during her lease and unlock their additional retained equity in their homestead Property.

15.     The **REEDS** understood from these communications that **EASYKNOCK's** program would operate as a loan secured by equivalent equity in their Property. **EASYKNOCK** proposed cashing out only a portion of their equity in the Property (about 69.5% of their Property's value), not the full value of the home. **EASYKNOCK** told them that they could pay off the amount **EASYKNOCK** funded in exchange for a release of **EASYKNOCK's** secured interest in that portion of the equity of their Property. In the interim, **REEDS** were told they would continue to live in their home and make monthly payments to **EASYKNOCK** just like they would for any traditional home equity loan.  The **REEDS** only ever intended the transaction to be a home equity loan, not a complete sale of their rights and interest in their homestead.

16.     In their communications with the **REEDS**, **EASYKNOCK's** representatives referred to themselves as "Equity Specialists."   Their advertisements and solicitations included the term "Home Refinance" for folks with poor credit and referred to the fact that the **REEDS** would continue to have at least a 30.5% equity stake in their Property.  They represented that the **REEDS** could regain 100% of the equity by paying off **EASYKNOCK's** loan.   And **EASYKNOCK** represented that if/when the **REEDS** ever decided to sell their home after closing on **EASYKNOCK's** transaction, the **REEDS** would receive $127,960 for their retained equity

stake in their Property.  Further, **EASYKNOCK** described that the **REEDS** would need to complete a credit and criminal background check as part of **EASYKNOCK's** "credit authorization."  Clearly, Defendants **EK REAL ESTATE** and **EASYKNOCK** recognized that the transaction made the basis of this suit was a "home equity loan" requiring credit and income authorization and that they were acting as "lenders."

17.     None of Defendants **LENDINGONE, EASYKNOCK,** or **EK REAL ESTATE** is a qualified lender in Texas with the Texas Office of Consumer Credit Commission (OCCC).

18.     Despite not being a qualified lender in Texas at the time of the "Sale-Leaseback" transaction, Defendants **EASYKNOCK** and **EK REAL ESTATE** represented to **REEDS** that the transaction was a "home equity loan."

19.     At the time of these transactions, none of the Defendants was even registered to conduct any type of business in Texas—despite them regularly doing so.

20.     To induce the **REEDS** to close on their "Sale-Leaseback" loan transaction, Defendants **EASYKNOCK** and **EK REAL ESTATE** repeatedly represented to the **REEDS** that their program was an alternative to a traditional loan, the program was new to Texas, and the program was an easy way to release and access a portion of the equity in their home.

21.     On October 15, 2018, Alan Sucher, an agent and representative of Defendants **EASYKNOCK** and **EK REAL ESTATE** who called himself an "Equity Specialist," sent the **REEDS** an email.

22.     That email contained an illustration of what the **REEDS** could expect if they agreed to **EASYKNOCK** and **EK REAL ESTATE**'s terms.  This email and illustration stated as follows:

From: **Alan Sucher** <alan@easyknock.com>
Date: Mon, Oct 15, 2018 at 6:24 PM
Subject: Sell & Stay Illustration
To: <kreed1099@gmail.com>

Hi Kenneth:

It was great to speak with you and collaborate on attaining financial flexibility without having to move out of your current home. I have created an illustration based on our discussion concerning your situation. **We want to tailor the solution to meet your specific needs** - so please keep in mind these numbers are not final and are open to discussion! After reviewing the illustration, please give me a call at your convenience, and we can send you an official proposal (with final numbers) after any remaining concerns are addressed.

## SELL AND STAY OFFER ILLUSTRATION

| | |
|---|---|
| Current Home Value: | $400,000  (est.) |
| Current Mortgage (and any liens): | $173,000  (est.) |
| Current Home Equity: | $227,000  (est.) |
| Proposed Funding Percentage: | 69.5% |

### Step 1 - Sell

**Release your home equity.**
↓

| | | |
|---|---|---|
| EasyKnock secures funding for property | $278,134 | |
| Mortgage Payoff: | -$173,000 | (Including any liens) |
| Processing Fee: | -$8,000 | |
| Title Insurance: | -$6,000 | |
| Closing Costs: | -$3,000 | |
| First Month's Rent: | -$3,600 | |
| Tax Escrow: | -$9,533 | |
| **Estimated funding provided to you as cash at closing** | **$75,000** | (Estimate) |

### Step 2 - Lease

**Stay in your home.**
↓

| | | |
|---|---|---|
| You retain a stake (called "Option Value") in the property | $121,866 | (Option Sellout Price)* |
| You continue living in your home and rent at a set rate | $3,600 | (Monthly Rent)* |

### Option 1 - Repurchase Home

**Keep your home.**
↓

| | | |
|---|---|---|
| You decide to re-establish 100% ownership (within three years) | | |
| EasyKnock sells your house back to you at the funding amount (plus 5%) | $292,040 | (Repurchase Price)* |

### Option 2 - Full Home Value Release

**Or, move when you are ready.**

| | | |
|---|---|---|
| Your property is listed with a realtor of your choice at full market value | $420,000 | (Sales Price)* |
| Your Repurchase Price is paid off | -$292,040 | (Repurchase Price)* |
| You receive your remaining property equity | $127,960 | (Realized Option Value)* |

23.     To further induce **REEDS** to enter into the transaction, **EASYKNOCK** and **EK REAL ESTATE** led **REEDS** to believe that they were receiving a home equity loan and that they would retain a stake in the ownership of their home.   As shown in the illustration above, **EASYKNOCK** and **EK REAL ESTATE** utilized phrases such as "proposed funding percentage," "secured funding," "[r]elease your home equity," and "retain a stake" to mislead **REEDS** to believe that they were obtaining a home equity loan—not that they were completely giving up all right and title to their residential homestead.

24.     **EASYKNOCK** and **EK REAL ESTATE** further represented that **REEDS** would maintain at least a 30.5% share of the equity in their Property and that **REEDS** would be entitled to another $127,960.00 in cash from their remaining equity in the Property.

25.     Based on **EASYKNOCK** and **EK REAL ESTATE's** representations about the transaction, including its operation as a home equity loan and the **REEDS'** retained equity interest in the Property, the **REEDS** ultimately agreed to go forward with **EASYKNOCK** and **EK REAL ESTATE's** "Sale-Leaseback" loan transaction. Based on their representations about what amounted to a home equity loan, on or about November 13, 2018, the **REEDS** deeded the Property to Defendant **EK REAL ESTATE**. *(See Exhibit "D" – General Warranty Deed with Vendor's Lien which is attached hereto and incorporated herein for all purposes.)* The Warranty Deed contained a Vendor's Lien in favor of Defendant **LENDINGONE**, who apparently had loaned to **EK REAL ESTATE** the sum of $293,000.00 to facilitate the "Sale-Leaseback" loan transaction for the Property. Upon information and belief, Defendant **EK REAL ESTATE** further executed a *Note, Deed of Trust, Commercial Security Agreement and Assignment of Rents* in favor of Defendant **LENDINGONE**.

26.     Defendant **LENDINGONE** advertises itself as a specialized mortgage lender which provides lending in all states except for Alaska, Nevada, North Dakota, South Dakota, and Utah. **LENDINGONE** is a licensed lender in four states: Arizona, Minnesota, Oregon, and Vermont. As a licensed lender, **LENDINGONE** is or should be familiar with the requirements and restrictions imposed on mortgage lenders under federal and Texas law, including those found in the Truth in Lending Act, the Texas Finance Code, and the Texas Property Code.

27.     Defendant **LENDINGONE** either did know or should have known that Defendants **EASYKNOCK** and **EK REAL ESTATE's** "Sale-Leaseback" loan transaction with **REEDS** and tens (if not hundreds) of other Texas citizens failed to comply with these requirements and restrictions. Nevertheless, Defendant **LENDINGONE** facilitated and enabled Defendants **EASYKNOCK** and **EK REAL ESTATE's** scheme by providing funding for a substantial portion of their improper loan transactions in Texas, including funding for the **REEDS'** loan.

28.     As a further part of these transactions, **REEDS** entered into a *Lease with Tenant Option Agreement* with Defendant, **EK REAL ESTATE**. *(See Exhibit "E" – Lease with Tenant Option Agreement which is attached hereto and incorporated herein for all purposes.)* The Lease was for an initial period of twelve (12) months at a rental rate of $43,200.00 per year ($3,600.00 per month) with the first payment being a prorated amount for November 13, 2018, through December 31, 2018, due and payable at closing on November 13, 2018.[1]

29.     The Lease was renewable for consecutive one-year terms—allegedly, in perpetuity. If certain conditions were met, the **REEDS** could pay off the loan by "repurchasing" **EASYKNOCK's** secured interest in the Property. To do so, however, the **REEDS** would have to

---

[1] The HUD statement (Exhibit "F") shows that the **REEDS** paid the initial rent payment for the period from November 13, 2018, through December 31, 2018, from the "loan" proceeds to **EK REAL ESTATE**.

tender a payment of $292,040.00, which amount escalated on an annual basis (at a rate equal to no less than 102.5% of the prior year's amount), plus all closing costs (including, but not limited to, broker's commissions, transfer taxes, attorney's fees, and filing fees) paid by Defendant **EK REAL ESTATE**. In the interim, the **REEDS** were responsible for paying all Rent and Additional Rent, including maintenance for the Property, due Defendant **EK REAL ESTATE** under the Lease.

30.     For the "right" to enter into a Lease for their Property—potentially, in perpetuity— **EK REAL ESTATE** charged **REEDS** $121,866.00, an amount which was deducted from the $400,000.00 alleged "Contract Sales Price." This Lease charge represented about 30% of the total stated purchase price for the Property.  The $43,200.00 per year base rent for year one of the Lease escalated in every consecutive one-year term of the Lease. After the "Sale-Leaseback" loan transaction, the **REEDS** remained solely responsible for all repairs and maintenance on the Property. If Defendant **EK REAL ESTATE** paid for any repairs or maintenance, the **REEDS**, as the Tenant, were responsible for reimbursement to Defendant **EK REAL ESTATE** as "Additional Rent."

31.     The rent charged by Defendants **EASYKNOCK** and **EK REAL ESTATE** to the **REEDS** exceeded the rental rates in Manvel, Brazoria County, Texas for similar properties. In addition to the $121,866.00 charge to lease the Property, Defendants **EASYKNOCK** and **EK REAL ESTATE** charged the **REEDS** monthly rent. Defendants **EASYKNOCK** and **EK REAL ESTATE** use a set formula (and not market rates) to charge victims of their wrongful "Sale-Leaseback" loan scheme, like the **REEDS**, monthly rent equal to approximately 0.75% of the equity amount **LENDINGONE** provided **EASYKNOCK** and **EK REAL ESTATE** at close (9% interest per year) *plus* prorated taxes and insurance for the Property. Thus, **EASYKNOCK** and

**EK REAL ESTATE's** monthly and other "rent" charges were not designed based on market rates for leasing properties like the **REEDS's** Property.  Rather, their monthly payment termed "rent" consisted of every amount that this transaction would cost **EASYKNOCK** and **EK REAL ESTATE** monthly: monthly insurance, monthly property taxes, and monthly interest on **LENDINGONE's** loan to **EASYKNOCK** and **EK REAL ESTATE**.  And **EASYKNOCK** and **EK REAL ESTATE** took security on the front end of this transaction in the form of the **REEDS'** entire equity value in their home, rather than just the value of the 69.5% equity needed to secure the amount funded.  **EASYKNOCK** and **EK REAL ESTATE** did this surreptitiously to ensure that its transaction costs would always be covered by the **REEDS'** alleged retained equity of 30.5% in the Property, not just the equity covered by its home equity loan funding.

32.    All invoices for the rent, past due rent, and other charges came from Defendant **EASYKNOCK.**

33.    Defendants never asked for, nor did they ever receive, a waiver of homestead from the **REEDS** in the "Sale-Leaseback" loan transaction.

34.    **EK REAL ESTATE** and **EASYKNOCK** obtained an appraisal to justify the $400,000.00 value ascribed to the **REEDS'** homestead Property.

2.    The Property was burdened by only one debt obligations that would need to be satisfied at closing out of the proceeds from the $400,000.00 "Contract Sales Price:" a mortgage lien in the amount of $174,134.36.  Based on an appraised value of at least $400,000 (the amount listed by **EASYKNOCK** and **EK REAL ESTATE** as the Contract Sales Price), at the time of closing, the **REEDS'** equity value in their Property was worth at least $ 225,865.64.  Thus, the **REEDS'** equity in their Property was worth about 56.5% of the total stated contract value of the Property.

35.     Despite having about $226,000.00 in equity in their Property, at the closing, the **REEDS** received "net sales proceeds" in cash of only $74,417.00 out of the listed $400,000.00 "Contract Sales Price," about 18.6% of the total alleged sales price and about 37.9% less than the **REEDS'** total equity percentage and value in their Property. In addition to outrageous closing costs burdened upon **REEDS** by Defendants, on the Settlement Statement, Defendants **EK REAL ESTATE** and **EASYKNOCK** deducted a charge of $121,866.00 as a "Tenant Option Agreement" from **REEDS'** remaining equity in the Property. *(See Exhibit "F" – HUD – Settlement Statement which is attached hereto and incorporated herein for all purposes.)*

36.     As per this HUD Settlement Statement, the **REEDS** received a total value of about $249,652.17 for their Property worth at least $400,000, about 62% of the Property's value.  This total value consisted of the payment of $74,417.00 to the **REEDS** in cash, the payment of $174,134.36 for the mortgage lien; $1,029.80 in property taxes and $71.01 in annual assessments in obligations tied to the Property.  In essence, Defendants stole **REEDS' P**roperty worth at least $400,000.00 for a total of only about $249,652.17 in value to the **REEDS** at closing.

37.     If this had been a real arms-length sale transaction, in exchange for the Deed to the entirety of her Property, the **REEDS** should have received the balance of the $400,000 alleged purchase price, $150,347.83 in cash (less reasonable closing costs). They did not receive these funds.

38.     Alternatively, if this transaction had been a traditional home equity loan, the **REEDS** should have retained an approximately 37.5% equity interest in their Property free and clear of any liens (this is derived from the **REEDS'** unpaid, retained equity of $150,347.83 divided by total alleged sales price $400,000.00, less reasonable closing costs).  Despite the disparity between the Contract Sales Price and the total value they received at closing, the **REEDS** did not

retain any equity in their Property.  Instead, at closing, Defendants **EK REAL ESTATE** and **EASYKNOCK** charged the **REEDS** several bogus amounts to make it seem as if they received the full $400,000 purchase price value in exchange for the deed to their Property.  And Defendants **EK REAL ESTATE** and **EASYKNOCK** removed the **REEDS'** names entirely from the deed to their Property, a fact they did not learn until much later.

39.     Pursuant to the "Sale-Leaseback" scheme, Defendants **EK REAL ESTATE** and **EASYKNOCK** charged the **REEDS** $121,866.00 for the Lease, and they strapped the **REEDS** to rental payments of $43,200.00 for the first twelve months of a lease, a rental amount which escalated over each consecutive one-year period before the **REEDS** had the opportunity to "purchase" back the Property for the sum of $292,040.00 (which also escalated on an annual basis), *plus* all amounts paid by **EK REAL ESTATE** at closing.  The **REEDS** were also responsible for Defendant **EK REAL ESTATE's** inflated closing costs and any other Rents or Additional Rents that were due.

40.     No disclosures were provided to **REEDS** by either Defendants **EASYKNOCK** or **EK REAL ESTATE** pursuant to the Truth-In-Lending Act or the Texas Finance Code, which require the following disclosures, among others, be given to **REEDS** before they entered into this transaction:

    a.  Full disclosure of loan costs and terms;

    b.  The right of rescission;

    c.  Disclosing to the borrower when mortgage was reassigned;

    d.  Disclosure of the caps on high mortgage costs; and

    e.  Assessing whether the borrower had the ability to repay the loan prior to entering into the transaction with the borrower.

41.     Indeed, neither **EASYKNOCK** nor **EK REAL ESTATE** (nor **LENDINGONE**) conducted any substantive assessment of **REEDS'** financial ability to repay the "loan" or to pay the monthly Rent, Additional Rent, or other amounts due under the Lease.   If they had, the documents would have shown that **REEDS'** income, credit, and savings were not enough to satisfy the Lease payments. Based on these documents, Defendants **EK REAL ESTATE** and **EASYKNOCK** knew or should have known that the **REEDS** would not be able to afford the rent payments prior to entering into the "Sale-Leaseback" loan transaction. Thus, Defendants knew the **REEDS** would be unable to pay the monthly and other Lease payments, let alone qualify for another loan to regain title to their residential homestead Property.

42.     By January 2019, the **REEDS** fell behind on Rent—just a few months into the Lease—and were being threatened with legal proceedings. All past due rental notices were being sent to the **REEDS** by Defendant **EASYKNOCK**. Although the **REEDS** paid what they could to Defendants **EASYKNOCK** and **EK REAL ESTATE,** they could not afford the entirety of the rent payments due and continued to get further behind on the Lease. By December 2019, about 13 months after closing, the **REEDS** would fall behind for good on the rental payments due Defendants **EASYKNOCK** and **EK REAL ESTATE.**

43.     The **REEDS** were in no financial position to cure the past due rents. Shortly thereafter, on December 11, 2019, Defendant **EK REAL ESTATE** filed a forcible entry and detainer cause of action in the Justice Court in Brazoria County, Texas (Case No. GEv19-331) seeking possession of the Property from the **REEDS**. On December 26, 2019, the day after Christmas, the **REEDS** were evicted from their Property by an Order of the Justice of the Peace Court, Precinct 4, Place 1 of Brazoria County, Texas. *(See Exhibit "G" – Judgment for Possession which is attached hereto and incorporated herein for all purposes.)*

44.     At the time of the eviction, Defendants **EASYKNOCK** and **EK REAL ESTATE** claimed the **REEDS** owed them about $21,600 in back rent.  Despite holding at least $121,000 of the **REEDS'** equity in the Property (having never paid that portion of the sales price and instead charging it to the REEDS as a lease fee), Defendants **EASYKNOCK** and **EK REAL ESTATE** proceeded with their judicial eviction on the day after Christmas.

45.     Defendants **EASYKNOCK** and **EK REAL ESTATE** ultimately resold the **REEDS'** Property, including the alleged retained interest and equity stake in the Property. **EASYKNOCK** and **EK REAL ESTATE** failed to provide the **REEDS** with any more money for their alleged remaining equity in the Property despite their illustrations representing the **REEDS** should receive $127,960 from any such sale.

## VIOLATIONS OF THE TRUTH IN LENDING ACT

46.     The **REEDS** adopt all preceding paragraphs as if recited verbatim herein.

47.     The **REEDS** are natural persons.

3.     At all times relevant hereto, Defendants **EASYKNOCK** and **EK REAL ESTATE** regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which by written agreement, is payable in more than four installments, and is the person to whom the transaction which is the subject of this action is initially payable, making Defendants a creditor within the meaning of the TILA, 15 U.S.C. § 1602(g) and Regulation Z § 226.2(a)(17). Under Texas law, a sale-leaseback transaction, like the one at issue in this case, is a "loan" or "equitable mortgage." *See* Tex. Fin. Code §341.001(9) and (10) and Tex. Prop. Code §41.006.

48.     The transaction in question is a consumer credit transaction within the meaning of TILA, 15 U.S.C. § 1602 and Regulation Z § 226.2. The security for the transaction is the primary dwelling of the **REEDS**.

49.     Defendants **EASYKNOCK** and **EK REAL ESTATE** did not provide to the **REEDS** a Truth-In-Lending Disclosure statement and as a result violated the requirements of the Truth In Lending Act in the following ways, among others:

    a.  By failing to provide the required disclosures prior to the consummation of the transaction in violation of 15 U.S.C. §§ 1638(b) and 1639, and Regulation Z § 226.17(b);

    b.  By failing to make the required disclosures clearly and conspicuously in writing in violation of 15 U.S.C. §§ 1632(a) and 1639, and Regulation Z § 226.17(a);

    c.  By failing to include in the finance charges certain charges imposed by Defendants payable by Plaintiff incident to the extension of credit as required by 15 U.S.C. § 1605 and Regulation Z § 226.18(d);

    d.  By failing to calculate and disclose finance charges on the amount financed per 15 U.S.C. § 1606 and Regulation Z § 226.22;

    e.  By failing to disclose that the **REEDS** had a right of rescission;

    f.  By failing to disclose to the **REEDS**: "If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan," as per 15 U.S.C. § 1639; and

    g.  By failing to meet the minimum standards for residential mortgage loans per 15 U.S.C. § 1639c, including the ability to repay standards and the prohibition on arbitration agreements in connection with the **REEDS'** principal dwelling.

50.     The **REEDS** did not discover, and through the exercise of reasonable diligence could not have discovered, the occurrence of Defendants **EK REAL ESTATE** and **EASYKNOCK**'s violations of TILA until the filing of this suit.  By reason of the aforesaid violations of the TILA and Regulation Z, Defendants are liable to the **REEDS** in the amount of twice the finance charge, actual damages to be established at trial, attorney's fees and costs, and any other amounts provided for under 15 U.S.C. § 1640.

**<u>TEXAS DECEPTIVE TRADE PRACTICES</u>**

51.     The **REEDS** adopt all preceding paragraphs as if recited verbatim herein.

52.     Plaintiffs are consumers under the Texas Deceptive Trade Practices Act ("DTPA")

because Plaintiffs are individuals who sought goods or services by purchase/lease.

53.     Defendants **EK REAL ESTATE** and **EASYKNOCK** violated the DTPA when

Defendants engaged in false, misleading, or deceptive acts that Plaintiffs relied on to Plaintiffs'

detriment. Specifically, Defendants violated the DTPA, among other ways, as follows:

    a. Representing that an agreement confers or involves rights, remedies, or obligations that it does not or that are prohibited by law.

    b. Failing to disclose information about goods and services that was known at the time of the transaction if the failure to disclose was intended to induce the consumer to enter into a transaction that the consumer would not have entered into if the information had been disclosed.

    c. Causing confusion or misunderstanding about the source, sponsorship, approval or certification of goods or services by another.

54.     More specifically, as described throughout this Complaint:

    a. The Sale-Leaseback loan transaction is a transaction that involves real property in Texas, namely the Property.

    b. Defendants **EASYKNOCK** and **EK REAL ESTATE** made multiple misrepresentations, and they concealed or failed to disclose facts to Plaintiff despite a duty to do so. Among other things, as described more specifically above, **EASYKNOCK** and **EK REAL ESTATE** falsely and misleadingly represented that they were authorized under Texas law to enter into the loan transaction that is the basis of this suit; the Sale-Leaseback loan transaction was a home equity loan; and **REEDS** would maintain their 30.5% interest in the equity of their Property after the Sale-Leaseback loan transaction.

    c. Defendants made additional false, deceptive, and material representations in their marketing materials. As described above, Defendants' marketing materials described their Sale-Leaseback transaction to the **REEDS** as an opportunity to "access" or "release" the

equity in their home, that the **REEDS** could "stay in [their] home," save on having to pay insurance and taxes while they lived in their home, and "move when [the **REEDS**] [are] ready."

d. As described above, Defendants falsely represented to **REEDS** that they would maintain a 30.5% share of the equity in their Property, and that they would receive an additional amount of $127,960.00 if/when the **REEDS** decided to move out and sell their Property.

e. Defendants made these misrepresentations and concealed/failed to disclose facts to induce Plaintiffs to enter into the Sale-Leaseback transaction for their Property.

f. Defendants knew Plaintiffs were unaware of the concealed/undisclosed facts and did not have an equal opportunity to discover these facts. Defendants were deliberately silent when they had a duty to speak about the concealed/undisclosed facts.

g. The representations and omissions were material and false.

h. Defendants made these representations or omitted material facts with the intent that Plaintiffs rely on the representations or omissions.

i. Plaintiffs relied on these representations and Defendants' nondisclosure.

j. The **REEDS** would not have entered into the transaction had Defendants disclosed facts regarding the transaction.

k. Defendants' misrepresentations and nondisclosure are a producing cause of the **REEDS'** injuries.

55. Defendants **EK REAL ESTATE** and **EASYKNOCK** violated the DTPA when Defendants engaged in an unconscionable action or course of action that, to the **REEDS'** detriment, took advantage of the **REEDS'** lack of knowledge, ability, experience, or capacity to a grossly unfair degree. Specifically, Defendants **EK REAL ESTATE** and **EASYKNOCK** induced the **REEDS** to enter into a "loan" transaction which was prohibited by law concerning their homestead knowing that Defendants were not qualified as lenders with the Texas Office of Consumer Credit Commission to lend against the **REEDS'** homestead. Defendants **EK REAL**

ESTATE and EASYKNOCK knew or should have known that the REEDS did not have the ability to pay back the loan on the onerous lending terms and rates and at charges that exceeded the maximum rates allowed by law.

56.     Defendants EK REAL ESTATE and EASYKNOCK violated the DTPA when Defendants engaged in false, misleading, or deceptive acts or practices that Plaintiffs relied upon to their detriment and that violated a "tie-in" consumer statute, specifically § 41.006 of the Texas Property Code, when Defendants induced Plaintiffs into entering into the "Sale-leaseback" transaction on their homestead. Furthermore, the marketing materials used by Defendant EASYKNOCK concerning the transaction referred to "accessing" and "releasing" the "equity" in their home, thus confusing this type of transaction with a home equity loan.

57.     The REEDS did not discover, and through the exercise of reasonable diligence could not have discovered, the occurrence of Defendants EK REAL ESTATE and EASYKNOCK's false, misleading, and deceptive acts and practices until after they were evicted from their Property in December 2019.

58.     It was impracticable for the REEDS to give Defendants EASYKNOCK and EK REAL ESTATE pre-suit written notice under the Texas Business & Commerce, § 17.505(a) ("DTPA") because Plaintiffs are nearing the end of their limitations period on their claim and EK REAL ESTATE has previously obtained an eviction order against them. Therefore, pre-suit written notice was not required.

59.     Defendants' wrongful conduct was a producing cause of the REEDS' injuries which resulted in the following damages:

a.  Plaintiffs seek unliquidated damages within the jurisdictional limits of this Court;

b.  Defendants acted knowingly and intentionally which entitles Plaintiffs to recover mental-anguish damages under the Texas

Business & Commerce Code § 17.50(b)(1) in an amount to be
determined by the trier of fact;

c.  Defendants acted knowingly and intentionally which entitles
Plaintiffs to recover treble economic and mental anguish damages
under the Texas Business & Commerce Code § 17.50(b)(1); and

d.  Plaintiffs are entitled to recover reasonable and necessary attorney's
fees for prosecuting this suit under Texas Business & Commerce
Code § 17.50(d) in an amount to be determined by the trier of fact.

## USURY UNDER THE TEXAS FINANCE CODE

60.   The **REEDS** adopt all preceding paragraphs as if recited verbatim herein.

61.   On or about November 13, 2018, Defendants **EK REAL ESTATE** and
**EASYKNOCK** loaned money to the **REEDS** disguised as a "Sale-Leaseback" loan transaction.
The loan between the **REEDS** and Defendants **EASYKNOCK** and **EK REAL ESTATE**, in
which **LENDINGONE** participated, only provided **REEDS** with $74,417.00 in cash and another
$174,134.36 to pay off obligations on the Property. Defendants **EK REAL ESTATE** and
**EASYKNOCK** had the Property appraised to look like a $400,000.00 sale to them from the
**REEDS.** From a purported sale of the Property for the sum of $400,000.00, Plaintiffs received a
total value of $248,551.36. Disguised as a Tenant Option Agreement on the HUD form,
Defendants **EK REAL ESTATE** and **EASYKNOCK** took a $121,866.00 fee and other excessive
fees against the sales price which should properly be categorized as interest.

62.   Plaintiffs had an obligation to repay the principal amount of Defendants' loan
because, no matter how the Lease terminated, voluntarily by the **REEDS** or involuntarily through
their default, the Lease requires that the Successor Purchaser Option Price is triggered, and the
loan is paid off from the proceeds.

63.     Defendants **EK REAL ESTATE** and **EASYKNOCK** contracted for and received interest that exceeded the maximum amount allowed by law by charging excessive fees including without limitation to the following:

     a.  Tenant Option Agreement - $121,866.00

     b.  Processing Fee - $8,000.00;

     c.  Lease Payments of $43,200.00 in the first year;

     d.  Lease Payments of at least $44,280.00 in the second year;

     e.  Lease Payments of at least $45,387.00 in the third year;

     f.  The difference between the amount received by Plaintiff for (or were satisfied by) the loan of $248,551.36, and the repayment option of $292,040.00, if repurchased within the first twelve months, at least $306,824.53 if repurchased within twenty-four months and at least $165,998.75 if repurchased within thirty-six months plus closing costs and rents; and

     g.  Excessive closing costs.

64.     Defendants' unlawful conduct caused injury to Plaintiffs which resulted in the following damages:

     a.  Statutory Penalties; and

     b.  Attorney's fees.

65.     Plaintiffs seek unliquidated damages within the jurisdictional limits of this Court.

66.     Plaintiffs are entitled to recover statutory penalties under Texas Finance Code § 305.001(a), that being the greater of the following:

     a.  Three times the amount by which the interest contracted for, charged, or received exceeds the maximum amount of interest allowed by the usury statute; or

     b.  $2,000.00 or 20% of the principal, whichever is less.

67.     In addition, since the interest charged and received under this contract exceeded twice the amount allowed by law, the **REEDS** are seeking and entitled to the forfeiture of all principal, interest and other amounts charged and received pursuant to Tex. Fin. Code § 305.002.

68.     The **REEDS** are further entitled to recover reasonable attorney's fees under Texas Finance Code § 349.001 against Defendants **EK REAL ESTATE** and **EASYKNOCK**. Plaintiff has hired the undersigned attorneys to represent her interests in this matter and has agreed to pay the attorneys a reasonable rate for their services. Plaintiffs **REEDS** seek to recover her reasonable and necessary attorney's fees from Defendants, jointly and severally, in this matter in an amount as determined by the trier of fact.

## ADDITIONAL VIOLATIONS OF TEXAS FINANCE CODE GOVERNING LOANS AND FINANCED TRANSACTIONS §§ 341.011– 354.007, *et seq.*

69.     Plaintiffs **REEDS** adopt all preceding paragraphs as if recited verbatim herein.

70.     At all times relevant hereto, the **REEDS** are considered an "obligor" under the Texas Finance Code and Defendants **EASYKNOCK** and **EK REAL ESTATE's** "Sale-Leaseback transaction is a "loan" under the Texas Finance Code. *See* Tex. Fin. Code § 341.001(9) and (10). This loan transaction was subject to the requirements of Texas Finance Code § 342.001, *et seq.* (Consumer Loans) and § 343.001, *et seq.* (Home Loans).

71.     In connection with the loan transaction at issue in this case, Defendants **EASYKNOCK** and **EK REAL ESTATE** violated the Texas Finance Code, among other ways, by:

      a. engaging in the business of making, transacting, or negotiating loans subject to this chapter without holding a license issued under this chapter, Tex. Fin. Code § 342.051;

      b. failing to make required disclosures, Tex. Fin. Code § 343.102;

      c. failing to provide required notices, Tex. Fin. Code § 343.105; and

d. engaging in a pattern or practice of extending credit to consumers under high-cost home loans based on the consumers' collateral without regard to the obligor's repayment ability, including the obligor's current and expected income, current obligations, employment status, and other financial resources, other than the obligor's equity in the dwelling that secures repayment of the loan, Tex. Fin. Code § 343.204.

72.     For violating these additional provisions of the Texas Finance Code, pursuant to Tex. Fin. Code. § 349.003, Defendants **EASYKNOCK** and **EK REAL ESTATE** are liable to the **REEDS** for (1) three times the actual economic loss to **REEDS** that resulted from each violation; or, alternatively, (2) since each violation was material and induced the **REEDS** to enter into a transaction that they would not have entered if the violation had not occurred, twice the interest or time price differential contracted for, charged, or received, not to exceed $4,000 because the amount financed exceeds $5,000. Defendants are also liable for the **REEDS'** reasonable attorney's fees in an amount to be determined by this Court

## **COMMON LAW AND STATUTORY FRAUD**

73.     The **REEDS** adopt all preceding paragraphs as if recited verbatim herein.

74.     Defendants **EASYKNOCK** and **EK REAL ESTATE** are liable to Plaintiffs for common law fraud, fraud by nondisclosure, fraudulent inducement, and, pursuant to Tex. Bus. & Com. Code § 27.0, statutory fraud.

75.     Specifically, as described throughout this Complaint:

a. The Sale-Leaseback loan transaction is a transaction that involves real property in Texas, namely the Property.

b. Defendants **EASYKNOCK** and **EK REAL ESTATE** made multiple misrepresentations, and they concealed or failed to disclose facts to Plaintiff despite a duty to do so. Among other things, as described more specifically above, **EASYKNOCK** and **EK REAL ESTATE** falsely and misleadingly represented that they were authorized under Texas law to enter into the loan transaction that is the basis of this suit; the Sale-Leaseback loan transaction was a

home equity loan; and **REEDS** would maintain their 30.5% interest in the equity of their Property after the Sale-Leaseback loan transaction.

c. Defendants made additional false, deceptive, and material representations in their marketing materials. As described above, Defendants' marketing materials described their Sale-Leaseback transaction to the **REEDS** as an opportunity to "access" or "release" the equity in their home, that the **REEDS** could "stay in [their] home," save on having to pay insurance and taxes while they lived in their home, and "move when [the **REEDS**] [are] ready."

d. As described above, Defendants falsely represented to the **REEDS** that they would maintain a 30.5% share of the equity in their Property, and that they would receive an additional amount of $127,960.00 if/when **REEDS** decided to move out and sell their Property.

e. Defendants made these misrepresentations and concealed/failed to disclose facts to induce Plaintiffs to enter into the Sale-Leaseback transaction for their Property.

f. Defendants knew Plaintiffs were unaware of the concealed/undisclosed facts and did not have an equal opportunity to discover these facts. Defendants were deliberately silent when they had a duty to speak about the concealed/undisclosed facts.

g. The representations and omissions were material and false.

h. Defendants made these representations or omitted material facts with the intent that Plaintiffs rely on the representations or omissions.

i. Plaintiffs relied on these representations and Defendants' nondisclosure.

j. In relying on these representations and without the knowledge of the undisclosed facts, Plaintiffs were injured.

76.     For the common law fraud claims, Plaintiffs seek and are entitled to recover, jointly and severally from Defendants **EASYKNOCK** and **EK REAL ESTATE,** their actual damages, exemplary damages, costs of court, and pre-and post-judgment interest.

77.     For their statutory fraud claims, Plaintiffs seek and are entitled to recover, jointly and severally from the Defendants **EASYKNOCK** and **EK REAL ESTATE**, their actual

damages, and, pursuant to Tex. Bus. & Com. Code § 27.01(d) and (e), exemplary damages, attorney's fees, expert witness fees, deposition-copy costs, costs of court, and pre-and post-judgment interest.

## CONSPIRACY

78.     The **REEDS** adopt all preceding paragraphs as if recited verbatim herein.

79.     Defendants **EASYKNOCK**, **EK REAL ESTATE**, and **LENDINGONE** are liable to Plaintiffs for participating in a conspiracy.

80.     Each of the Defendants was a member of a conspiracy. They conspired to commit acts of fraud and other statutory and common law torts, as described above. In so doing, the Defendants had a meeting of the minds to accomplish the wrongful acts described above, committed one or more acts in furtherance of the conspiracy to commit the unlawful causes of action described above and caused Plaintiffs actual harm as a result of their conspiratorial conduct.

81.     Accordingly, Plaintiffs are entitled to recover from each conspirator Plaintiffs' actual damages and exemplary damages, as well as for such conspirator's joint and several liability with the other actors concerning each cause of action described above. In connection, with the statutory torts, the **REEDS** are entitled to recover from each conspirator, jointly and severally, their attorney's fees, expert witness fees, deposition-copy costs, costs of court, and pre-and post-judgment interest.

## AIDING AND ABETTING

82.     The **REEDS** adopt all preceding paragraphs as if recited verbatim herein.

83.     Defendants **EASYKNOCK**, **EK REAL ESTATE**, and **LENDINGONE** are liable to Plaintiffs for aiding and abetting one or more of the others in the conduct described in this Complaint.

84. Specifically, as described throughout this Complaint:

    a. Each Defendant committed torts;

    b. Each Defendant had knowledge that these primary actors' actions constituted torts;

    c. the Defendants had the intent to assist these primary actors in committing the torts;

    d. each of the Defendants gave the primary actors assistance or encouragement; and

    e. the assistance or encouragement provided by the Defendants was a substantial factor in causing the tort.

85. Alternatively, as described throughout this Complaint:

    a. the primary actors' activity accomplished a tortious result;

    b. each of the Defendants provided substantial assistance to the primary actors in accomplishing the tortious result;

    c. each of the Defendants' own conduct, separate from the primary actors', breached duties owed to Plaintiffs; and

    d. the participation of each Defendant was a substantial factor in causing the tort.

86. Plaintiffs are entitled to recover damages from each of the Defendants, jointly and severally, for each cause of action they aided & abetted.

## DECLARATORY JUDGMENT

87. The **REEDS** adopt all preceding paragraphs as if recited verbatim herein.

88. Plaintiffs are entitled to declaratory relief under the Texas Uniform Declaratory Judgments Act, Chapter 37 of the Texas Civil Practice and Remedies Code.  Plaintiffs seek the following declarations:

    a. the Property at issue in this dispute was the **REEDS'** residential homestead;

    b. because the Property was the **REEDS'** residential homestead, any transaction associated with the Property required compliance with the Texas

Property Code, including the restrictions of Tex. Prop. Code § 41.006 (a) and (b);

c. Defendants **EASYKNOCK**, **EK REAL ESTATE**, and **LENDINGONE's** taking of a deed in connection with the Sale-Leaseback transaction at issue in this case is a deceptive trade practice under Subchapter E, Chapter 17, Business & Commerce Code (Tex. Bus. & C. §17.41 *et seq.*);

d. Defendants' deed in connection with the underlying Sale-Leaseback transaction is void and no lien legally attached to the **REEDS'** residential homestead property (the Property) as a result of the purported sale;

e. The Sale-Leaseback transaction at issue in this case is a "loan" under the Texas Finance Code, *see* Tex. Fin. Code §341.001(9) and (10), and is subject to the requirements of Texas Finance Code §342.001, et. seq. (Consumer Loans) and §343.001, et seq. (Home Loans).

f. The Tenant Lease Option, Rent, and Additional Rent are considered interest under the Texas Property Code.

89. Plaintiffs have retained the undersigned counsel to represent them in this action and have agreed to pay the foregoing attorneys their reasonable and necessary attorneys' fees. An award of reasonable and necessary attorneys' fee in an amount as determined by the trier of fact to Plaintiffs would be equitable and just, it is authorized by §37.009 of the Tex. Civ Prac. & Rem. Code, and it is sought by Plaintiffs.

## JURY DEMAND

90. Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER

Plaintiffs **TRENICE REED** and **KENNETH REED** pray that the Court enter Judgment in favor of **TRENICE REED** and **KENNETH REED,** jointly and severally against Defendants **EK REAL ESTATE SERVICES OF NY, LLC**, an Affiliate of **EASYKNOCK, INC.,**

**EASYKNOCK, INC.,** and **LENDINGONE, INC.**, for the damages as set forth herein and for such other and further relief, in law or at equity, to which she may be justly entitled.

Dated: November 11, 2021.

Respectfully submitted:

By:___/s/ Robin Ziek_____

Robin Ziek, Attorney at Law
Attorney-In-Charge
State Bar No. 22262575
Federal I.D. No. 8231
24 Greenway Plaza, Suite 2050
Houston, TX 77046
Telephone: (713) 222-8030
Facsimile: (832) 565-9011
rziek@sbcglobal.net

**ATTORNEYS FOR TRENICE REED AND KENNETH REED**

**OF COUNSEL:**
**POGACH PLLC**
Adam D. Pogach
State Bar No. 24048734
Federal I.D. No. 634567
24 Greenway Plaza, Suite 2050
Houston, TX 77046
Telephone: (713) 524-5400
Facsimile: (713) 524-540
Email: adam@lawdifferent.com

**FELDMAN & FELDMAN, P.C.**

Cris Feldman
State Bar. No.: 24012613
Federal I.D. No. 712459
3355 W. Alabama Street, Suite 1220
Houston, Texas 77098
Telephone: (713) 986-9471
Facsimile: (713) 986-9472
Email: cris.feldman@feldman.law